Filed 7/16/14  P. v. Tate CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>VIRGIL TYRONE TATE,<br><br>    Defendant and Appellant. | 2d Crim. No. B250706<br>(Super. Ct. No. TA121825)<br>(Los Angeles County) |

Virgil Tyrone Tate appeals a judgment following conviction of two counts of first degree murder (Pen. Code, §§ 187, subd. (a), 189; counts 1 and 2),[1] and one count of willful, deliberate and premeditated attempted murder (§§ 187, subd. (a), 664, subd. (a); count 3).  The jury found true the multiple-murder special circumstance allegation (§ 190.2, subd. (a)(3)), and the allegations that appellant personally used a deadly weapon (knife) in the commission of the three offenses (§ 12022, subd. (b)(1)) and inflicted great bodily injury upon the victim in count 3 (§ 12022.7, subd. (a)).

The trial court sentenced appellant to concurrent terms of life without the possibility of parole on counts 1 and 2, plus a one-year consecutive term on count 1 based upon the deadly weapon allegation (§ 12022, subd. (b)(1)).  As to count 3, the court imposed a concurrent term of life with the possibility of parole, together with a three-year

---

[1] All statutory references are to the Penal Code unless otherwise stated.

enhancement based upon the great bodily injury allegation (§ 12022.7, subd. (a)).  It stayed imposition of sentence on the deadly weapon enhancements in counts 2 and 3 pursuant to section 654 and awarded appellant 558 days of presentence custody credit. As noted by the Attorney General, the trial court orally imposed a single $40 court security fee (§ 1465.8, subd. (a)(1)) and a single $30 criminal conviction (court facilities) assessment (Gov. Code, § 70373, subd. (a)(1)), instead of the mandatory $40 fee and $30 assessment for *each* count.  The minute order and abstract of judgment include the correct fee and assessment for each count.

Appellant contends the trial court erred by declining to instruct the jury on voluntary manslaughter and provocation.  We conclude no instructional error occurred, but modify the court's imposition of judgment to reflect the mandatory court security fee and criminal conviction assessment for each count.  We affirm in all other respects.

## FACTS

Jason Cacia rented a room in a three-bedroom condo in Torrance for several months.  Carol Susan Brooks (Susan) and her husband, Sean Jurgens, occupied one of the bedrooms.  Susan's adult daughter, Tracie Brooks (Tracie) and her boyfriend, appellant, occupied the third bedroom.  Tracie and appellant had lived there for four years.  Although Cacia, who had previously worked with Susan, got along with his roommates, his interaction with them was minimal.

On January 28, 2012, Jurgens, a long-haul truck driver, left on an out-of-state trip.  The next day, Cacia returned to the condo at approximately 6:30 p.m., after attending his grandmother's birthday party.  Everything seemed normal.  Cacia had a brief conversation with Susan, who was using the computer.  He did not see anyone else inside the condo.  Cacia went into his bedroom, turned on the television and began working on his taxes.  About 30 to 45 minutes later, Cacia heard Susan arguing with someone with a male voice.  He could not identify the male voice or understand what was being said.  He assumed Susan was arguing with her husband, as that frequently occurred.  Cacia turned up the volume on his television and tuned out the argument.

2

After about 20 to 30 minutes of arguing, Cacia heard Susan say, "No, no." Cacia lowered the volume on his television to determine if someone was in distress. A minute or two later, Cacia heard two "thuds" on his bedroom door. At that point, he realized "something's not right." His bedroom door then opened and appellant appeared, holding a knife in his right hand. Appellant approached Cacia and stabbed him in the arm and forehead. Cacia, who significantly outweighed appellant, picked up a laundry basket and used it to shield himself from appellant. Appellant kept trying to attack Cacia, but at some point, appellant left the room. Cacia closed and locked his bedroom door.

Appellant then kicked open Cacia's bedroom door, breaking the lock. Appellant again tried to stab Cacia, who protected himself with the laundry basket. Appellant left the room after Cacia kicked him in the groin area. Cacia closed the door, leaned against it to prevent appellant from reentering and called 9-1-1 on his cell phone. He told the operator, "I just got stabbed. My roommate's going crazy, and he's trying to stab other people in the house right now." While he was on the phone, appellant said, in a calm voice, "Jason, come out here. They're after me." When Cacia did not leave the bedroom, appellant pushed the door partially open and reached inside with his hand, which held a broken piece of glass. Appellant cut Cacia on the temple and cheek with the jagged glass.

When Cacia heard the police at the front door, he looked out of his bedroom door. Susan's bedroom door was open and appellant's door was closed. Cacia noticed the front door was locked and that a wooden "two-by-four" board had been placed across brackets on each side of the door. Cacia removed the wooden board and allowed the police to enter.

Los Angeles County Deputy Sheriff Jonathan White arrived as Cacia was being escorted out of the condo. Cacia was taken to the hospital via ambulance. He received approximately 30 stitches for his injuries and remained in the hospital for two days. At the time of trial, Cacia still had scars on his face and shoulder stemming from the attack.

3

As deputies were ordering all remaining occupants to exit with their hands up, Deputy White saw curtains moving near the window of the northeast bedroom. A male inside the condo stated, "If you come in here, I'll kill her. She's still alive." He further stated he would release "her" in 30 minutes. He also said, "I saw her cheating on me," or "I saw her cheat on me."

Deputies from a SWAT-type team arrived and made additional requests for the suspect to exit the building. The male voice replied, "Don't come in," or "Her life is in your hands." Following a lull in communications, appellant stuck his head out of the window and told Deputy White he was being set up and did not hurt anyone. Appellant also said he was "going to burn for what [he did]" and wanted the deputies to shoot and kill him. He said, "I want to die." Completely nude, appellant began crawling out of the window. His speech was rapid and he was yelling.

Eventually, deputies forced their way into appellant's bedroom and detained him. Appellant, who was drenched in blood, said he had been set up and framed. He was lucid and showed no signs of being under the influence of drugs or alcohol. He had minor scratches to his hands, but no other wounds.

*Physical Evidence*

Deputies discovered Tracie's body on the floor in the family room, which was just inside the entrance to the condo. She was nude and had suffered multiple "gaping" stab wounds to her face, neck, and back. There was blood spatter over the entire floor and pooled blood and fecal matter next to the couch. A kitchen knife was found at the base of the couch. A second knife was found under a chair. Appellant's blood-soaked Los Angeles Dodgers jacket was in the dining room area.

There was pooled blood inside the kitchen, and smeared drag marks leading to the area where Tracie's body was located. Based on this evidence, Deputy Gary Sloan, the lead investigator, opined that Tracie was initially attacked in the kitchen and then dragged to the family room.

Susan's body was found in appellant's bedroom. The room was in complete disarray. Susan had suffered multiple "gaping" stab wounds to her chest, neck, and face.

4

In the hallway, there was a "heavy drag mark," consisting of blood and fecal matter, leading to appellant's bedroom. In light of the markings, Deputy Sloan testified Susan was stabbed near the couch in the family room and then dragged to appellant's bedroom.

Deputies found a broken wine glass, with jagged edges, in the hallway outside of Cacia's bedroom. They also found a kitchen knife, with a serrated blade containing blood, in the same area.

When Deputy Sloan entered the condo, he detected a strong odor of natural gas coming from the kitchen. The gas stove had been pulled away from the wall, and all of the gas burner valves had been turned on. The valves were covered in blood. Deputy Sloan opined that the gas was turned on in an attempt to blow up the condo and conceal evidence. He described the scene as "pure carnage," saying it "was probably the bloodiest, most violent crime scene that [he had] ever witnessed" in his 23 years as a deputy.

*Medical Evidence*

Dr. Louis Pena performed Tracie's autopsy. Tracie suffered a total of 15 stab wounds, as well as smaller puncture wounds. There were three wounds to her right lower neck area. Two of these wounds were fatal. The injuries to the neck would have produced a large amount of bleeding. The neck bone was cut, indicating that a great deal of force had been used. Tracie suffered three stab wounds on her back, two of which were fatal. The knife entered the chest cavity and cut the left lung. There was a two-inch cut on Tracie's spleen. She died quickly from blood loss.

Tracie did not have any defensive wounds to her fingers or hands. The knife found under the chair in the family room was a six-inch paring knife, which was consistent with causing Tracie's injuries. There were no injuries to her genitalia. The vitreous fluid behind the eyeball was measured for alcohol content, which revealed an alcohol level of .13 percent. Marijuana was also detected.

Dr. Pedro Ortiz performed Susan's autopsy. Susan suffered 32 distinct sharp force injuries, and 8 blunt force trauma injuries. Many of the wounds were to her face and head. She had eight stab wounds to the neck, chest, and abdomen, and three

5

defensive wounds on her left hand. Three of the six wounds to Susan's chest were fatal, as they cut her left lung and heart. She died within minutes of the attack.

*DNA Evidence*

Criminalist Mariann Shea of the Sheriff's Department Scientific Services Bureau analyzed various evidentiary items. The blade of the knife found at the base of the couch contained blood matching Susan's DNA profile. The handle of that knife contained a mixture of three DNA profiles. Susan and Cacia were included as possible contributors. There was insufficient information as to the third DNA profile to make a comparison.

The knife found under the chair contained blood on both sides of the blade. The DNA profile contained mixtures consistent with two people. Tracie's DNA matched that of the major contributor. A blood stain on the kitchen counter matched Tracie's DNA profile. The DNA profiles from a blood stain on the kitchen range and kitchen counter were consistent with two people, with Tracie being a major contributor, and appellant being a minor contributor. The DNA profile for a blood stain on the gas valve knob on the stove was a mixture of two people, with appellant and Tracie included as possible contributors.

The knife found outside Cacia's bedroom contained blood on the left and right sides. The DNA profile was from two people. The profile of the major contributor was consistent with Cacia's DNA profile. The DNA profile from the knife handle was a mixture of three people, with Susan and Cacia included as possible contributors. The DNA profile from the piece of broken wine glass found outside Cacia's room matched Cacia's DNA profile.

Semen was detected on the external genital, vaginal, cervical, and anal samples taken from Tracie. It also was detected in samples taken from Susan's neck, right breast and left breast. Appellant's DNA profile matched the DNA profile of the semen on both victims. There was no semen or DNA found in swabs taken from Susan's vaginal, anal or rectal areas.

No defense evidence was presented.

6

## DISCUSSION

### *Claimed Failure to Instruct on Voluntary Manslaughter*

Defense counsel asked the trial court to instruct the jury on the lesser included offense of voluntary manslaughter on a heat of passion theory (CALCRIM No. 570),[2] based on appellant's statement to police that he had seen "her" cheating on him. The trial court denied the request, finding insufficient evidence to support this theory. Appellant contends this was error. We disagree.

A trial court has a duty to instruct on a lesser included offense when there is substantial evidence, viewed in the light most favorable to the defendant, from which a rational jury could conclude that the defendant committed the lesser offense and that he is not guilty of the greater offense. (*People v. Turk* (2008) 164 Cal.App.4th 1361, 1368, fn. 5; *People v. DePriest* (2007) 42 Cal.4th 1, 50; *People v. Breverman* (1998) 19 Cal.4th 142, 162.) The court is not required, however, to give an instruction on the heat-of-passion theory of voluntary manslaughter (or attempted voluntary manslaughter) where there is a lack of "substantial evidence that defendant acted while under 'the actual influence of a strong passion' [citation] in response to legally sufficient provocation, such as caused him to '"act rashly or without due deliberation and reflection, and from this passion rather than from judgment" ' [citation]." (*People v. Moye* (2009) 47 Cal.4th 537, 553.)

"The heat of passion requirement for manslaughter has both an objective and a subjective component. [Citation.] The defendant must actually, subjectively, kill under the heat of passion. [Citation.] But the circumstances giving rise to the heat of passion are also viewed objectively. . . . '[T]his heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the

---

[2] CALCRIM No. 570 states, in relevant part: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] The defendant killed someone because of a sudden quarrel or in the heat of passion if: [¶] 1 The defendant was provoked; [¶] 2 As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured (his/her) reasoning or judgment; [¶] AND [¶] 3 The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment."

7

given facts and circumstances' . . . ."  (*People v. Steele* (2002) 27 Cal.4th 1230, 1252–1253.)

Here, the only evidence proffered by appellant to support the voluntary manslaughter instruction was his pre-arrest statement to police that "I saw her [presumably Tracie] cheating on me" and his sudden, extreme behavior.  There is no evidence, however, as to when appellant observed the alleged "cheating."  A killing is not voluntary manslaughter if sufficient time has elapsed following the provocation for the passions of a reasonable person to cool.  (*People v. Dixon* (1995) 32 Cal.App.4th 1547, 1555.)  In the absence of any temporal link between the alleged provocation (observing Tracie cheating on him) and the killing, the evidence did not support an instruction on heat-of-passion manslaughter.  (*Ibid.*; see *People v. Cole* (2004) 33 Cal.4th 1158, 1173, 1216 [evidence that defendant was intoxicated and jealous and that his girlfriend had threatened to "put a butcher knife in your ass" if he fell asleep on the couch was legally insufficient to support heat-of-passion instruction]; see also *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1144 ["*passion for revenge . . .* will not serve to reduce murder to manslaughter"].)  Moreover, there is absolutely no evidence Susan or Cacia engaged in any provocative conduct.  (*People v. Moye, supra,* 47 Cal.4th at pp. 549-550; *People v. Trinh* (June 5, 2014, S115284) 59 Cal.4th 216 [2014 WL 2535253, *8].)

In addition, given the overwhelming evidence of appellant's guilt, any error in omitting the voluntary manslaughter instruction was harmless under either the harmless beyond a reasonable doubt standard (*Chapman v. California* (1967) 386 U.S. 18, 24), or the reasonable probability of a more favorable result standard (*People v. Watson* (1956) 46 Cal.2d 818, 836).  In convicting appellant of first degree murder in counts 1 and 2, the jury necessarily found he acted willfully, deliberately and with premeditation.  (CALCRIM No. 521.)  It also found that the attempted murder of Cacia was committed willfully, deliberately and with premeditation.  Thus, the jury necessarily resolved against appellant his assertion that he acted in the heat of passion.  (See *People v. Wharton* (1991) 53 Cal.3d 522, 572 [a finding of premeditation and deliberation is "manifestly inconsistent" with acting in the heat of passion].)  The record demonstrates

8

beyond a reasonable doubt appellant would not have obtained a more favorable verdict had the instruction been given.

*Claimed Failure to Instruct on Provocation*

Appellant argues the trial court erred by failing to instruct the jurors pursuant to CALCRIM No. 522 that evidence of provocation may be considered in deciding whether the murder was first or second degree.[3] The People correctly assert that CALCRIM No. 522 is a "pinpoint" instruction, to be given only on request. (*People v. Rogers* (2006) 39 Cal.4th 826, 878-879 [addressing predecessor instruction, CALJIC No. 8.73]; *People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1333 [instruction on provocation for second degree murder is a pinpoint instruction that need not be given sua sponte by the trial court].)

Appellant concedes CALCRIM No. 522 is a pinpoint instruction, but claims it was requested by defense counsel. The record is to the contrary. Counsel requested a voluntary manslaughter instruction based on a heat of passion theory. CALCRIM No. 522 was not included in the requested jury instructions, and counsel did not orally request an instruction on provocation in connection with the degree of murder. In any event, as discussed, the facts did not support a provocation defense.

*Mandatory Fees and Assessments*

The trial court orally imposed a single $40 court security fee (§ 1465.8, subd. (a)(1)) and a single $30 criminal conviction assessment (Gov. Code, § 70373, subd. (a)(1)). It is undisputed the $40 fee and $30 assessment should have been orally imposed on *each* of the three counts. (*People v. Woods* (2010) 191 Cal.App.4th 269, 272; *People v. Castillo* (2010) 182 Cal.App.4th 1410, 1415, fn. 3; *People v. Roa* (2009) 171 Cal.App.4th 1175, 1181.)

---

[3] CALCRIM No. 522 states, in relevant part: "Provocation may reduce a murder from first degree to second degree . . . . The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder."

"'Rendition of judgment is an oral pronouncement.'" (*People v. Mesa* (1975) 14 Cal.3d 466, 471, superseded by statute on other grounds as stated in *People v. Turner* (1998) 67 Cal.App.4th 1258, 1267-1268.)  Entry of judgment in the minutes is a clerical function.  (*Ibid*.)  The court's minute order and abstract of judgment include the mandatory court security fees, totaling $120, and criminal conviction assessments, totaling $90, and thus are inconsistent with the oral pronouncement.  "Where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls."  (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385.)  Accordingly, we modify the oral pronouncement of the judgment to include the statutorily mandated fee and assessment for each count.  (See *People v. Smith* (2001) 24 Cal.4th 849, 854 [an unauthorized sentence may be corrected at any time whether or not there was an objection in the trial court]; *People v. Hong* (1998) 64 Cal.App.4th 1071, 1075 [failure to impose a mandatory fine is jurisdictional error, which can be raised for first time on appeal and corrected by modifying the judgment].)

DISPOSITION

The trial court's oral pronouncement of judgment is modified to impose a $40 court security fee (§ 1465.8, subd. (a)(1)) for each count, totaling $120, and a $30 criminal conviction assessment (Gov. Code, § 70373, subd. (a)(1)) for each count, totaling $90.  Because the minute order and abstract of judgment include the correct fees and assessments, no other action is necessary.  As modified, the judgment is affirmed.

NOT TO BE PUBLISHED.


                                        PERREN, J.

We concur:


          GILBERT, P. J.


          YEGAN, J.


10

Arthur M. Lew, Judge

Superior Court County of Los Angeles

_____

Donna L. Harris, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Linda C. Johnson, Supervising Deputy Attorney General, Theresa A. Patterson, Deputy Attorney General, for Plaintiff and Respondent.